UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARCO PEREZ,
    Plaintiff,


    v.                                              CIVIL ACTION NO. 21-10607-MPK[1]


M. LICON-VITALE,
PATRICIA RUZE,
JULIE FABREGAS-SCHINDLER,
    Defendants.


MEMORANDUM AND ORDERS ON
DEFENDANTS' MOTIONS TO DISMISS (#36, #47)

KELLEY, U.S.M.J.

I. Introduction.

As set forth in this *Bivens* complaint,[2] pro se plaintiff Marco Perez fell off a ladder in 1997,

badly injuring his back. In 1999, 2001, and 2004, he had surgery. Apparently, the surgeries were

not successful, as he continues to experience significant pain. (#1 at 4-5; #1-1 at 5.)

Perez was previously serving a sentence at various Bureau of Prisons ("BOP") facilities.

From May 2019 to February 2020, he was held at the Federal Correctional Institute ("FCI") –

---

[1] The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (#9.)

[2] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The complaint consists of what the court will refer to as the form complaint (#1) and the additional complaint (#1-1 at 1-6), as well as the documents attached to them, which mostly consist of medical, prison, and court records. (#1-1 at 7-13; #1-2 to #1-29.) It is not entirely clear, but Perez may also mean to incorporate the allegations from his emergency motion for an injunction (#2) by reference into the complaint. *See*, *e.g.*, #1 at 5. The court has reviewed all these submissions.

Danbury, in Connecticut. There, he had consultations with a neurosurgeon, Scott Sanderson, who recommended spinal fusion surgery. Because FCI-Danbury could not provide appropriate post-operative care, Perez was transferred to Federal Medical Center ("FMC") – Devens, in Massachusetts, where he remained until June 2021, when he was released from BOP custody and taken into Immigration and Customs Enforcement custody.

While held at FMC-Devens, Perez had consultations with another neurosurgeon, Stephen Gutting, who disagreed with the spinal fusion surgery recommendation. Instead, Dr. Gutting recommended pain management, including a spinal cord stimulator ("SCS") trial. Prior to his release from BOP custody, Perez did not receive the spinal fusion surgery recommended by Dr. Sanderson but did participate in the SCS trial recommended by Dr. Gutting.

Perez alleges that, in violation of the Eighth Amendment guarantee against cruel and unusual punishment, defendants – the warden and a physician at FCI-Danbury and a physician at FMC-Devens – were deliberately indifferent to his serious medical need. He seeks, among other things, the spinal fusion surgery and damages. (#1 at 2, 5; #1-1 at 1, 4-5.)

Defendants have filed two motions to dismiss. Perez has not filed an opposition to either, although eight months ago he requested an extension of time to file an opposition to the first. Perez has had ample time to file oppositions, and the court will not wait indefinitely to the prejudice of defendants. For the reasons set out below, this case is dismissed.

II. Perez's Underlying Incarceration and Prior Civil Litigation.[3]

In 2016, Perez was charged in the United States District Court for the Northern District of Illinois with drug offenses and illegal reentry.[4] Later in 2016, he brought suit in the United States District Court for the Central District of Illinois regarding his medical care while in custody.[5] In 2017, he pled guilty to a drug offense and illegal reentry and was sentenced to 70 months in prison, to be followed by supervised release.[6]

In 2019, while serving his sentence at FCI-Danbury, Perez filed a habeas petition in the United States District Court for the District of Connecticut ("2019 habeas petition").[7]

In February 2020, Perez was transferred from FCI-Danbury to FMC-Devens. The 2019 habeas petition was transferred from the District of Connecticut here. In February 2021, this court denied the 2019 habeas petition without prejudice to filing a complaint under *Bivens*.[8] During the

---

[3] Perez lists his prior civil litigation in the form complaint and the court has verified that the criminal cases discussed here are associated with the BOP register number that Perez lists. *See* #1 at 2, 9-11. His prior civil litigation is recounted only in support of an inference that he is familiar with how the litigation process works, in particular, the requirement that he file oppositions to motions on time.

[4] *See United States v. Perez*, U.S. Dist. Ct. N.D.Ill. #16-cr-401-VMK, #1, criminal complaint; #28, indictment.

[5] *See Perez v. Huffines*, U.S. Dist. Ct. C.D.Ill. #16-cv-2343-JES, #7, civil complaint, #40, order granting defendant's motion for summary judgment.

[6] *See Perez*, U.S. Dist. Ct. N.D.Ill. #16-cr-401-VMK, #93, plea agreement; #117, judgment of conviction.

[7] *See Perez v. Licon-Vitale*, U.S. Dist. Ct. D.Conn. #19-cv-1639-VLB, #1, habeas petition.

[8] *See Perez v. Licon-Vitale*, U.S. Dist. Ct. D.Mass. #20-cv-10930-MPK, ##19, 20, orders regarding transfer; #39, order denying habeas petition.

pendency of the 2019 habeas petition, Perez brought suit in the Northern District of Illinois regarding his medical care while in custody.[9]

III. Proceedings on this *Bivens* Complaint and in a Subsequent Habeas Case.

This *Bivens* complaint was docketed in April 2021. Summonses were issued for M. Licon-Vitale, identified by Perez as the warden of FCI-Danbury; Julie Fabregas-Schindler, identified by Perez as a physician there; and, Patricia Ruze, identified by Perez as a physician at FMC-Devens. *See* #4, summonses; *see also* #1 at 2; #1-1 at 1.[10] As noted above, in June 2021, Perez completed his sentence but was taken into immigration custody.

Perez did not timely file proof of service of this *Bivens* complaint and the summonses on defendants. The court sua sponte extended the deadline to complete service, until August 26, 2021, and then until September 9. (##12, 14.) Subsequently, on Perez's motion, the court extended the deadline again, until November 1. (##15, 17.)

In October 2021, Perez filed a letter and attachments indicating that certified mail was sent and delivered to the Assistant United States Attorney, who had previously entered an appearance

---

[9] *See Perez v. Bureau of Prisons et al.*, U.S. Dist. Ct. N.D.Ill. #20-cv-2963-GF, #1, civil complaint; #13, order to show cause.

[10] The court has previously noted the discrepancies in Perez's pleadings as to naming defendants. (##12, 14, 39.) Amy Boncher, the warden at FMC-Devens, is listed in the caption of the form complaint but not the body and in the body of the additional complaint but not the caption. *Compare* #1 at 1, 2-3 *with* #1-1 at 1. Despite notice of discrepancies and ample time, Perez did not clarify or, apparently, make any effort to serve Warden Boncher. *See* #27. This court is not the first to warn Perez about such discrepancies. *See Perez*, U.S. Dist. Ct. N.D.Ill. #20-cv-2963-GF, #16, order dismissing amended complaint without prejudice, at 3. At any rate, for much the same reasons that Perez fails to state a plausible Eighth Amendment claim against Dr. Ruze, *see infra*, he would have failed to state a plausible Eighth Amendment claim against Warden Boncher. Finally, if Perez is purporting to sue the BOP under the *Bivens* doctrine, *see* #1-1 at 1 (BOP listed in caption of additional complaint but not body), he cannot. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 484-485 (1994).

and consented to proceeding before a United States Magistrate Judge, *see* #7; #9, and Dr. Ruze, and sent but not delivered to Warden Licon-Vitale and Dr. Fabregas-Schindler. (#27.) The court nevertheless ordered the Assistant United States Attorney to file a responsive pleading as to Dr. Ruze and to indicate whether the government would accept service as to Warden Licon-Vitale and Dr. Fabregas-Schindler. (#28.)

Before the extended time for response by the government expired, Perez filed a habeas petition regarding his medical care in immigration custody. (#31) ("2021 habeas petition"). A few weeks later, he filed a duplicate of the 2021 habeas petition, resulting in the Clerk's Office opening a new case, on December 15, 2021.[11]

In this case, on December 17, 2021, the government filed a motion to dismiss on behalf of Warden Licon-Vitale and Drs. Fabregas-Schindler and Ruze, arguing, in part, that Perez has not established personal jurisdiction over the warden and Dr. Fabregas-Schindler and that, regardless, he fails to state a plausible Eighth Amendment claim. (#36) ("first motion to dismiss"); *see* #37, memorandum. Perez's opposition to defendants' first motion to dismiss was due on December 31. No opposition was filed.

In the case before Judge Young, the government proffered that Perez was deported to Mexico, on December 28, 2021. Judge Young subsequently dismissed that case as moot.[12]

In this case, on January 13, 2022, Perez sought an extension of time to file an opposition to defendants' first motion to dismiss, noting that he had been deported. (#38.) On January 21, the

---

[11] *See Perez-Ocampo v. Plymouth County Sheriff Department*, U.S. Dist. Ct. D.Mass. #21-cv-12055-WGY, #1, habeas petition; #1-1, cover letter.

[12] *See Perez-Ocampo*, U.S. Dist. Ct. D.Mass. #21-cv-12055-WGY, #9, notice regarding deportation; #10, order dismissing case.

court extended the deadline to February 25. (#39.)[13] On February 7, the court denied Perez's renewed motion for appointment of counsel and reaffirmed the February 25 deadline. (##40, 40-1, 41.) On February 28, the court extended the deadline to March 25 and ordered Perez to file a notice of change of address. (#44.)[14]

On August 15, 2022, defendants filed a motion to dismiss for want of prosecution. (#47) ("second motion to dismiss"). Perez's opposition to defendants' second motion to dismiss was due on August 29. No opposition was filed.

## IV. Second Motion to Dismiss (#47).

The court's independent review of publicly available records from other federal courts revealed that after his deportation, Perez was charged with, and pled guilty to, illegal reentry. He is now serving a 46-month sentence.[15]

It is fair to presume that Perez's ability to litigate this case was hampered by his deportation and is now hampered by his incarceration. However, he apparently is able to contact the court when he wishes to, because on June 30, 2022, he wrote a letter in the case before Judge Young, and on July 16, he filed a motion in that case.[16]

---

[13] The court also denied Perez's emergency motion for an injunction (#2) and dismissed the 2021 habeas petition (#31) as moot. *See* #39 at 5.

[14] Due to court error, copies of the January 21, February 7, and February 28, 2022 orders sent to Perez were returned as undeliverable. (##42, 43, 45, 46.)

[15] Review of the docket in U.S. Dist. Ct. N.D.Ill. #16-cr-401-VMK revealed that jurisdiction over Perez's supervised release was transferred to the United States District Court for the Southern District of Texas, and review of the dockets in *United States v. Perez*, U.S. Dist. S.D. Tex. #7:22-cr-579-RC, and *United States v. Perez-ocampo*, #7:22-cr-179-RC, revealed that, on January 19, 2022, Perez was charged with illegal reentry on January 18. He was indicted. On March 29, he pled guilty. On June 2, he was sentenced. *See Perez-ocampo*, U.S. Dist. Ct. S.D.Tex. #7:22-cr-179-RC, #1, criminal complaint; #8, indictment; 3/29/22 minutes; 6/2/2022 minutes; #24 judgment of conviction; *see also Perez*, U.S. Dist. Ct. S.D.Tex. #7:22-cr-579-RC, #8, revocation judgment.

[16] *See Perez-Ocampo*, U.S. Dist. Ct. D.Mass. #21-cv-12055-WGY, #11 (letter); #13 (motion).

In this case, however, Perez has not filed any pleadings for the past eight months. He had notice of defendants' first motion to dismiss, because he moved for an extension of time to file an opposition. Since he was deported in December 2021 and incarcerated beginning in January 2022, it is fair to presume that he did not have notice of the extensions. But he should have known that an opposition would be due within some reasonable amount of time.

The court has broad discretion to dismiss a case for want of prosecution. *Link v. Wabash R. Co.*, 370 U.S. 626, 629-630 (1962); *see McKeague v. One World Tech.*, *Inc.*, 858 F.3d 703, 707-708 (1st Cir. 2017); *see also* Fed. R. Civ. P. 41(b). The court finds that Perez's recent silence in this case, especially when compared with his recent contact with the court in the case before Judge Young, indicates a lack of interest in pursuing this case.

Yet there is a "strong presumption" in favor of deciding claims on the merits. *Malot v. Dorado Beach Cottages Assoc.*, 478 F.3d 40, 43 (1st Cir. 2007). Although the court believes that it would be well within its broad discretion to allow defendants' second motion to dismiss, in light of that presumption and the circumstances discussed above, it proceeds to defendants' first motion to dismiss, which presents compelling, uncontroverted arguments.

## V. First Motion to Dismiss (#36).

Defendants argue that Perez fails to allege facts that support a finding of personal jurisdiction over Warden Licon-Vitale and Dr. Fabregas-Schindler. (#37 at 8-12.) Defendants do not argue that the court lacks personal jurisdiction over Dr. Ruze but do argue that Perez fails to state a plausible Eighth Amendment claim as to any defendant. (#37 at 12-18.) As discussed below, the court agrees with defendants and allows their first motion to dismiss.[17]

---

[17] The court need not address defendants' other arguments, including that they are entitled to qualified immunity and that official-capacity claims against them are barred by sovereign

A. <u>Relevant Law</u>.

1. <u>Deliberate indifference to a serious medical need</u>.

The Supreme Court has recognized that deliberate indifference by a prison official to a serious medical need of an inmate can constitute cruel and unusual punishment in violation of the Eighth Amendment, cognizable under the limited *Bivens* framework, which allows some suits for damages against federal officials in their individual capacities for actions taken under the color of federal law. *See Sires v. Berman*, 834 F.2d 9, 12 (1st Cir. 1987) (42 U.S.C. § 1983) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)); *see also Carlson v. Green*, 446 U.S. 14, 18-23 (1980) (*Bivens*).[18]

A cruel-and-unusual-punishment claim must meet two prongs: (1) an objective prong requiring proof that the inmate had a "serious medical need" for which the prison official provided inadequate medical care; and (2) a subjective prong requiring proof that the prison official had a sufficiently culpable state of mind, that is, "deliberate indifference."  *See Snell v. Neville*, 998 F.3d 474, 494-495, 497 (1st Cir. 2021); *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014).

Under the objective prong, the prison official does not have to provide ideal medical care or the medical care that the inmate prefers. *See Snell*, 998 F.3d at 495; *Kosilek*, 774 F.3d at 82. She need only "provide care at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Snell*, 998 F.3d at 495 (citations and punctuation omitted); *see also Kosilek*, 774 F.3d at 82.

---

immunity. *See* #37 at 19-25. The court's rulings below also dispense with any requests for non-monetary relief. *See* #1-1 at 6.

[18] Defendants' second motion to dismiss was filed two months after the Supreme Court issued *Egbert v. Boule*, --- U.S. ---, 142 S.Ct. 1793 (2022), and defendants raise no issue regarding the impact of the decision on the *Bivens* analysis here. *See* #47. Accordingly, the court does not address that question.

Under the subjective prong, deliberate indifference does not require intentional harm, but does require more than negligence or malpractice. *See Snell*, 998 F.3d at 497; *Kosilek*, 774 F.3d at 83. The prison official "must have known of the risk of harm to [the inmate] and disregarded it. . . . Deliberate indifference consequently occupies a narrow band of conduct that is so inadequate as to shock the conscience." *Snell*, 998 F.3d at 497 (citations and punctuation omitted); *see also Kosilek*, 774 F.3d at 83.

Allegations that simply reflect a disagreement on the appropriate course of treatment generally fall short of stating an actionable cruel-and-unusual-punishment claim. *See Feeney v. Corr. Med. Srvcs., Inc.*, 464 F.3d 158, 162 (1st Cir. 2006) (on motion for summary judgment); *see also Wright v. Ruze*, #20-cv-10369-ADB, 2022 WL 408435, at *4 (D. Mass. Feb. 10, 2022) (on motion to dismiss for failure to state claim); *accord Ruiz-Rosa v. Rullán*, 485 F.3d 150, 156 (1st Cir. 2007); *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993); *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980). "Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, deliberate indifference may be found where the attention received is so clearly inadequate as to amount to a refusal to provide essential care." *Feeney*, 464 F.3d at 163 (punctuation omitted) (quoting *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991)); *see Wright*, 2022 WL 408435, at *4.

### 2. Personal jurisdiction.

In federal question cases, constitutional limits on the court's exercise of personal jurisdiction are drawn in the first instance from the due process standard of the Fifth, not the Fourteenth, Amendment. The Fifth Amendment standard requires minimum contacts with the United States; the Fourteenth Amendment standard requires minimum contacts with the forum state, that is, Massachusetts. *See Waters v. Day & Zimmerman NPS, Inc.*, 23 F.4th 84, 92 (1st Cir.

2022); *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992); *Lorelei Corp. v. County of Guadalupe*, 940 F.2d 717, 719-720 (1st Cir. 1991); *see also Tassinari v. Salvation Army Nat'l Corp.*, #21-cv-10806-LTS, --- F. Supp. 3d ---, 2022 WL 2397542, at *3 (D. Mass. June 22, 2022).

Although personal jurisdiction and service of process are distinguishable, they are intertwined, as service of process is a way by which the court obtains personal jurisdiction in federal question cases. *United Elec.*, 960 F.2d at 1085. In most federal question cases, Fed. R. Civ. P. 4(k)(1) sets forth the framework for obtaining personal jurisdiction by service of process. *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121-122 (1st Cir. 2022). Under Rule 4(k)(1)(A), personal jurisdiction may derive from a state long-arm statute. *Motus*, 23 F.4th at 122.

Ultimately, the court must determine whether the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, authorizes the exercise of personal jurisdiction over the defendants and whether the exercise of personal jurisdiction comports with the Fourteenth Amendment due process standard, as state law is constrained by that provision. *See Waters*, 23 F.4th at 94; *Tassinari*, 2022 WL 2397542, at *3; *see also Lorelei*, 940 F.2d at 719-720; *see, e.g.*, *Reynolds v. Angelotti*, #20-cv-10165-FDS, 2021 WL 1264801, *3, 4 & n. 5 (D. Mass. April 5, 2021) (outlining this familiar two-step inquiry in *Bivens* action); *K.O. v. Sessions*, 436 F. Supp. 3d 442, 448-449 & n. 2 (D. Mass. 2020) (same).

The Massachusetts long-arm statute provides that

[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;

(e) having an interest in, using or possessing real property in this commonwealth;

(f) contracting to insure any person, property or risk located within this commonwealth at the time of contracting;

(g) maintaining a domicile in this commonwealth while a party to a personal or marital relationship out of which arises a claim for divorce, alimony, property settlement, parentage of a child, child support or child custody; or the commission of any act giving rise to such a claim; or

(h) having been subject to the exercise of personal jurisdiction of a court of the commonwealth which has resulted in an order of alimony, custody, child support or property settlement, notwithstanding the subsequent departure of one of the original parties from the commonwealth, if the action involves modification of such order or orders and the moving party resides in the commonwealth, or if the action involves enforcement of such order notwithstanding the domicile of the moving party.

Mass. Gen. Laws ch. 223A, § 3.

Either general or specific jurisdiction will comport with due process. *Tassinari*, 2022 WL 2397542, at *5 (citation omitted); *see Reynolds*, 2021 WL 1264801, at *3. General jurisdiction exists if the defendants have engaged in "continuous and systematic activity" in the forum, though unrelated to the plaintiff's claims. *Reynolds*, 2021 WL 1264801, at *3 (quoting *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001)).

For specific jurisdiction, the defendants' forum-based activity must be related to the plaintiff's claims. In determining whether specific jurisdiction exists, the court conducts a three-step inquiry, asking whether the plaintiff's claims "directly arise out of, or relate to" the defendants' forum-based activity; whether the defendants' forum-based activity evinces "purposeful availment" of the privilege of conducting activity in the forum, thereby invoking the

benefits and protections of its laws and making the defendant's involuntary presence before its courts "foreseeable;" and, whether the exercise of personal jurisdiction is "reasonable." *Reynolds*, 2021 WL 1264801, at *3 (quoting *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016)); *see Tassinari*, 2022 WL 2397542, at *5.

3. Standards of review.

a. Fed. R. Civ. P. 12(b)(6).

A complaint must include "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard does not require detailed factual allegations but does require more than labels and conclusions or a recitation of the elements of a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (punctuation omitted) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff sets forth sufficient factual matter to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citing *Twombly*, 550 U.S. at 556). This plausibility standard is not a "probability standard" but does demand more than a sheer possibility that the defendant is liable. *Id.* (quoting *Twombly*, 550 U.S. at 556).

On a Rule 12(b)(6) motion, the court may consider the complaint, as well as documents attached to the complaint, if there is no challenge to their authenticity, or documents sufficiently referred to, or relied upon, in the complaint. *Rivera v. Kress Stores of Puerto Rico, Inc*., 30 F.4th 98, 102 (1st Cir. 2022); *see Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). It may also consider

facts subject to judicial notice under Fed. R. Evid. 201. *Freeman v. Town of Hudson*, 714 F.3d 29, 36-37 (1st Cir. 2013).

Under Rule 12(b)(6), the court distinguishes factual allegations from conclusory legal allegations; while it is bound to accept well-pleaded factual allegations as true, it need not accept conclusory legal allegations. *Cardigan v. Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015); *see also Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. The court construes factual allegations in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in his favor. *U.S. ex. rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011).

A pro se complaint must be interpreted liberally. *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997). However, pro se status does not insulate a plaintiff from complying with procedural and substantive law. *Id*. The policy behind affording a pro se complaint liberal interpretation is that if it presents sufficient factual support, then the court may surmise the claim, even if improperly pled. *Id*. This is different from a case in which the claim is properly pled but the factual support for the claim is missing. *Id*. Dismissal of a pro se complaint is warranted if the complaint fails to state an actionable claim. *Wright*, 2022 WL 408435, at *4.

b. Fed. R. Civ. P. 12(b)(2).

When the defendants move to dismiss under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of establishing that the court's exercise of personal jurisdiction over them is statutorily authorized and comports with due process. *Motus*, 23 F.4th at 121. Here, the "prima facie" approach controls. That approach "asks only whether the plaintiff has proffered facts that, if credited, would support all facts essential to personal jurisdiction." *Id*. (citation and punctuation omitted).

Under the prima facie approach, the plaintiff does not necessarily have to plead sufficient jurisdictional facts in the complaint, as long as the record includes sufficient jurisdictional facts. *Motus*, 23 F.4th at 123. However, if the plaintiff neither pleads sufficient jurisdictional facts in the complaint nor proffers sufficient jurisdictional facts in supplemental filings, dismissal is appropriate. *Id.*

B. Discussion.

1. Dr. Ruze.

a. The allegations.[19]

While held at FCI-Danbury, on January 27, 2020, Perez had a follow-up consultation with Dr. Sanderson, a neurosurgeon, who recommended spinal fusion surgery. (#1-1 at 2); *see also* #1-4 (Dr. Sanderson's January 27, 2020 report).

Dr. Sanderson's January 27, 2020 report reads, in relevant part:

[Perez] has severe degenerative disc disease at L3-4, L4-5 and L5-S1 with 2 previous discectomy levels with a total of 3 different surgeries. I do not have the results but he feels that since the last one he has been getting worse.
. . .
Ultimately it is not clear that surgery will be good for him at all but given his young age, diffuse symptoms, failure of medical management including injection therapy and medical treatment, I think that he is a reasonable candidate for surgery. Unfortunately surgery would necessitate an L3-S1 fusion. Those kinds of surgeries in and of themselves can frequently be not successful, especially in those with previous surgery and nonspecific symptoms.

That being said, it [is] hard to believe that he [will] be a good candidate for other types of pain management strategies like implantation of an implanted medication pump or spinal cord stimulator. Therefore I think that his best chance of symptomatic improvement is an L3-S1 fusion. . . .

---

[19] Dr. Ruze is not alleged to have been involved in Perez's medical care while he was held at any prison other than FMC-Devens. Many of Perez's allegations and exhibits pertain to his medical care while he was held at other prisons and are thus of marginal relevance to this analysis. The court discusses Perez's allegations and exhibits pertaining to his medical care at FCI-Danbury as context for his allegations regarding his medical care by Dr. Ruze at FMC-Devens.

(#1-4 at 6); *see also* #1-1 at 2.[20]

Three days later, an official at FCI-Danbury made a re-designation request, citing Perez's severe degenerative disc disease and Dr. Sanderson's spinal fusion surgery recommendation. (#1-1 at 2); *see also* #1-5 at 2. Less than two weeks later, Perez was re-designated. (#1-1 at 2.)

Nine days after he was transferred from FCI-Danbury to FMC-Devens, on February 21, 2020, Perez met with Dr. Ruze. (#1-1 at 2.)[21] Perez told Dr. Ruze about Dr. Sanderson's spinal fusion surgery recommendation; Dr. Ruze told Perez that he needed to have a consultation with a neurosurgeon in Boston. *Id.*

Five days later, on February 26, 2020, Perez met with Dr. Ruze again. Dr. Ruze told Perez that because he was at a new facility, he would need to "start the process," including an MRI, pain management, and consultation with a neurosurgeon, "over again." (#1-1 at 2); *see id.* at 4; *see also* #1-11 at 31.

Less than three months later, on May 19, 2020, Perez, in Dr. Ruze's presence, had a telehealth visit with Dr. Gutting, a neurosurgeon. (#1-1 at 2); *see also* #1-6 (Dr. Gutting's May 19, 2020 report). Perez alleges as follows regarding this May 19 consultation:

> On May 19, 2020, Perez had a phone call with a neurosurgeon named Dr. Stephen Gutting while his Physician, Dr[.] Ruze[,] was in the room. During this call, Dr. Gutting had stated that he was not provided all of Perez's medical records regarding his spinal injury. Without them he could only recommend that Perez see someone for pain management. . . .

---

[20] To Perez's benefit, the court assumes that Dr. Sanderson was not the first to make the spinal fusion surgery recommendation. *See, e.g.*, #1-23 at 5; *id.* at 10, 12; *see also* #1-11 at 26, 28. That assumption does not alter the court's analysis.

[21] In an exhibit here, which appears to be a paragraph of more recent allegations added to the end of an unsigned "affidavit" filed with the 2019 habeas petition, it is alleged that, on February 21, 2020, Dr. Ruze requested a consultation with a neurosurgeon "without even seeing" Perez. (#1-11 at 31.)

(#1-1 at 2.)

> Dr. Gutting's May 19, 2020 report reads, in relevant part:
>
> I have reviewed [Perez's] outside MRI of the lumbar spine that shows bulging disc at L3-4, L4-5 and slightly at L5-S1. I do not see much in the way of spondyiolisthesis. He [has] received different recommendations from spine surgeons for an L3-S1 fusion. I am in disagreement with that. I think he has had 3 previous surger[ies] and has a chronic pain syndrome/postiaminectomy syndrome. Injections of failed medications are failing. I would consider [a] spinal cord stimulator trial for this patient before embarking on a multilevel fusion which had put the rate of success somewhere around 50%. This was [dis]cussed in detail with the patient and also Dr. Ruze. I offered help setting up a pain clinic referral either to UMass or to Saint Elizabeth's.

(#1-6 at 3.)

As set forth in the additional complaint, Perez attempted to arrange for his complete medical records to be sent by FMC-Devens officials to Dr. Gutting. Thus, he filed a request to staff; in response, he was told to talk to his "PCPT," who could coordinate the release of information; he talked to Dr. Ruze, who told him to talk to the Medical Department; he filed another request to staff; because he did not receive a response from the Medical Department, he filed a request for informal resolution; in response, he was given Dr. Gutting's address and told to request and mail his medical records himself. (#1-1 at 2-3); *see also* #1-7 at 2.[22]

In the additional complaint, Perez alleges that, on August 24, 2020, he was taken to Saint Elizabeth's ("SEMC") as part of the pain management process. However, when he got to the pain clinic, he "was told that the BOP did not get process approval so he was turned away." (#1-1 at 3.)

---

[22] From exhibits documenting these efforts, it is apparent that Perez knew that Dr. Gutting, on May 19, 2020, disagreed with the spinal fusion surgery recommendation. Perez seems to have been attempting to arrange for his complete medical records to be sent so that Dr. Gutting would reconsider. *See* #1-7 at 2; #1-8 at 2.

A report from SEMC dated August 24, 2020 suggests that Perez was seen by providers then. (#1-9.) It reads, in relevant part:

> . . . –[Perez] has tried and failed conservative and interventional pain procedures with limited success. Dr. Gutting, neurosurgery, has seen the patient and recommends SCS trial versus a L3-S1 multilevel fusion at this time.
> - [Perez] is a good candidate for a SCS trial – would prefer less in[v]asive option
> -Will need to have psychiatry evaluation for clearance prior to SCS trial.

(#1-9 at 3.)

On October 19, 2020, Perez was taken back to SEMC for the SCS trial. The device was implanted. (#1-1 at 3.)[23]

Perez returned to FMC-Devens, where officials tried multiple settings on the device without improvement to his symptoms. (#1-1 at 3.) According to Perez, Dr. Ruze "knew full well that pain management would not work as Dr. Sanderson wrote in his January 27, 2020 report." *Id*.

On October 23, 2020, Perez was taken back to SEMC. A provider told him that a permanent SCS device would be implanted. (#1-1 at 3.) However, Dr. Ruze "never explained this to [Perez] and in fact knew that it did not help [his] painful back problem." *Id*. The provider removed the trial SCS device and told Perez that he had to see Dr. Gutting to discuss spinal fusion surgery. *Id*.[24]

Perez attempted to arrange a follow-up consultation with Dr. Gutting. (#1-1 at 3.)[25] On December 1, 2020, Warden Boncher responded to his administrative complaint that in light of the

---

[23] SEMC's October 19, 2020 report confirms that the trial SCS device was implanted on that date. (#1-10 at 2-3.)

[24] SEMC's October 23, 2020 report confirms that the trial SCS device was removed on that date. (#1-11 at 2-4.)

[25] It is apparent from the additional complaint and exhibits documenting these efforts that an official from FMC-Devens submitted a request for a consultation with Dr. Gutting either before or in early November 2020 and that the request was approved in or around mid-November, but not scheduled. *See* #1-1 at 3; *see also* #1-11 at 9, 12.

COVID-19 pandemic, non-emergency consultations would be scheduled as soon as the appointments became available. *Id.*; *see also* #1-11 at 12. According to Perez, by that point, the BOP had 11-plus months to take him to see a neurosurgeon. (#1-1 at 3.) Perez appealed but there was no response. *Id.*

As set out in the additional complaint, on December 29, 2020, Perez had a second telehealth visit with Dr. Gutting, who "disagreed with Dr. Sanderson that Perez needed Spinal Fusion Surge[r]y, but felt that he was suffering from chronic pain syndrome." (#1-1 at 3); *see also* #11-1 at 6-7 (Dr. Gutting's December 29, 2020 report). The plan was for Perez and Dr. Gutting to have a third telehealth visit during which Dr. Gutting would discuss what he, and the pain clinic, would do moving forward. (#1-1 at 3.)

Dr. Gutting's December 29, 2020 report states, in relevant part:

> [Perez] has been advised by another surgeon for an L3-S1 laminectomy and fusion. I feel he has a chronic pain syndrome and that a multi-level fusion is not going to be beneficial in the long-term. I will talk to Pain Clinic about options moving forward and will set-up a Telehealth visit to discuss. He always has the option of going to another surgeon for the surgery.

(#1-11 at 6.)[26]

As of February 20, 2021, FMC-Devens officials had not arranged Perez's third telehealth visit with Dr. Gutting. (#1-1 at 3.)

---

[26] Also on December 29, 2020, Perez filed a request that FMC-Devens officials send his complete medical records to Dr. Gutting but there was no response. (#1-1 at 3.) In this request, it was alleged that Dr. Gutting told Perez that surgery would be "too dangerous," and that Dr. Gutting would have to contact the provider at SEMC for the records from the SCS trial. (#1-11 at 13.)

b. <u>The allegations are insufficient</u>.

The court agrees with defendants, *see* #37 at 14-18, that Perez has not stated a plausible claim that Dr. Ruze was deliberately indifferent in failing to arrange the spinal fusion surgery recommended by Dr. Sanderson but not Dr. Gutting.[27] Dr. Sanderson, on January 27, 2020, recognized that surgery might not be "good" for Perez "at all," but viewed him to be a "reasonable candidate" and the surgery to be his "best chance" of improving symptoms. Even still, Dr. Sanderson acknowledged that the surgery would require spinal fusion and, "frequently," that type of surgery is "not successful," especially for patients with previous surgery and nonspecific symptoms. (#1-4 at 6.) Dr. Sanderson's recommendation was hardly definite.

Significantly, more recently than January 27, 2020, Dr. Gutting disagreed with the spinal fusion surgery recommendation. On May 19, Dr. Gutting opined that Perez had chronic pain or postiaminectomy syndrome and explained that he would consider a SCS trial before considering surgery, putting the "success" rate of spinal fusion at "somewhere around 50%." (#1-6 at 3.) After the SCS trial failed, on December 29, Dr. Gutting still was unwilling to recommend spinal fusion surgery. He believed that surgery would not be "beneficial in the long-term" for Perez, whom he maintained had chronic pain syndrome. (#1-11 at 6.)

In brief, Perez's allegations regarding Dr. Ruze's failure to arrange the spinal fusion surgery, even accepted as true and construed liberally and in his favor, simply reflect a disagreement on the appropriate course of treatment, not that the attention he received was "so clearly inadequate as to amount to a refusal to provide essential care." *Feeney*, 464 F.3d at 162, 163 (citations and punctuation omitted); *see*, *e.g.*, *Wright*, 2022 WL 408435, at *5 (granting Rule

---

[27] Defendants argue that Perez's allegations do not satisfy either the objective or subjective prong. *See also* #37 at 13-14. The court focuses on the subjective prong, aware that they overlap. *Kosilek*, 774 F.3d at 83 n. 7.

12(b)(6) motion as to plaintiff's claims regarding Dr. Ruze's failure to recommend shoulder surgery and order third pre-operative MRI; allegations and supporting medical records simply reflected disagreement on appropriate course of treatment).

The court addresses, briefly, two apparent claims that are distinct from Perez's claim regarding spinal fusion surgery. He also seems to be claiming that Dr. Ruze was deliberately indifferent because (1) she made him "start the process," including a consultation with a neurosurgeon, "over again," causing delay in his treatment, *see* #1-1 at 2, 4; and (2) she did not send his "FULL" medical records to Dr. Gutting, *see* #1-1 at 2-3, 4.

First, given the "speculative value" of Dr. Sanderson's spinal fusion surgery recommendation, any decision by Dr. Ruze to obtain review of Dr. Sanderson's conclusions before moving ahead with spinal fusion surgery would be regarded as "understandable," not deliberately indifferent. *Feeney*, 464 F.3d at 162-163 (affirming grant of Rule 56 motion as to plaintiff's claims regarding failure to provide orthotics; given "speculative value" of podiatrist's recommendation of orthotics as means of excluding plantar fasciitis diagnosis, physician's decision to obtain review of podiatrist's conclusions before moving ahead with orthotics was "understandable"). Even if Dr. Ruze had not been aware of the indefinite nature of Dr. Sanderson's spinal fusion surgery recommendation, it would have been wholly reasonable for Perez's history and present condition to be assessed by a neurosurgeon on his arrival at FMC-Devens, before Dr. Ruze booked that type of procedure.

Furthermore, just 14 months elapsed between Perez's arrival at FMC-Devens and his bringing suit. That span largely coincided with the COVID-19 pandemic.[28] During that time, Perez

---

[28] By proclamation issued on March 13, 2020, the President declared a national emergency concerning the COVID-19 pandemic. *See* 85 Fed. Reg. 15337, 2020 WL 1272563 (Mar. 13, 2020). The emergency declaration was continued beyond March 1, 2021, *see* 86 Fed. Reg. 11599, 2021

saw Dr. Ruze twice; consulted with Dr. Gutting; participated in the SCS trial; and, consulted with Dr. Gutting again. Given the "ongoing efforts" to identify the source of his back pain and to alleviate it through other measures,[29] Perez has not stated a plausible deliberate indifference claim based on delay. *Feeney*, 464 F.3d at 162-163 (summary judgment; given "ongoing efforts" to identify source of plaintiff's foot pain and alleviate it through other measures, 22-month gap between initial, unheeded recommendation of orthotics and plaintiff's actual receipt of orthotics did not amount to deliberate indifference).

Lastly, crediting his unsent-medical-records allegations and interpreting them liberally and favorably, one might consider whether Perez has stated a claim for negligence.[30] Deliberate indifference, however, requires more. *Cf.*, *e.g.*, *Leavitt v. Corr. Med. Srvcs., Inc.*, 645 F.3d 484, 498-499 (1st Cir. 2011) (reversing grant of summary judgment in favor of defendant who did not review viral load report; inadvertence or carelessness would not suffice but plaintiff presented enough evidence for jury to conclude that defendant chose not to review report, including defendant's alleged statement to plaintiff that he would not provide plaintiff with HIV medications

---

WL 754367 (Feb. 24, 2021), and then beyond March 1, 2022, *see* 87 Fed. Reg. 10289, 2022 WL 523889 (Feb. 18, 2022).

[29] The SCS trial was one such measure. The court notes that Perez has made no claim that Dr. Ruze was deliberately indifferent in failing to provide him with pain medications. *See*, *e.g.*, #1-10 at 2 (SEMC's October 19, 2020 report listing current medications).

[30] At least as it appears from the administrative complaints in this record, in May-June 2020, Perez wanted his complete medical records sent to Dr. Gutting because they showed that earlier pain injections failed. *See* #1-7 at 2; #1-8 at 2. In December 2020, Perez wanted his complete medical records sent to Dr. Gutting because they showed that the SCS trial failed. *See* #1-11 at 13. Dr. Gutting, however, appears to have been generally aware of all this information and still did not recommend spinal fusion surgery for Perez. *See* #1-6 at 3 ("Injections of failed medications are failing"); #1-11 at 6 ("His SCS trial was not successful").

because they were too expensive), *citing Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002) (mere loss of medical records does not rise to level of deliberate indifference).

Defendants' first motion to dismiss is allowed insofar as it seeks dismissal as to Dr. Ruze under Fed. R. Civ. P. 12(b)(6).

### 2. <u>Warden Licon-Vitale and Dr. Fabregas-Schindler</u>.

The court dismisses the case against Warden Licon-Vitale and Dr. Fabregas-Schindler for lack of personal jurisdiction. In the form complaint, Perez identifies Dr. Fabregas-Schindler as a physician at FCI-Danbury and Licon-Vitale as the warden, listing FCI-Danbury's address for both. (#1 at 2.)[31] The record shows that Dr. Fabregas-Schindler was involved in Perez's medical care at FCI-Danbury, while the warden was involved in the denial of Perez's administrative complaint at FCI-Danbury regarding the dosage of a pain medication. *See* #1-28 at 2-5; #1-23 at 22.

Yet the record does not show, or even hint, that Warden Licon-Vitale and Dr. Fabregas-Schindler engaged in activity at FMC-Devens or elsewhere in Massachusetts. Thus, defendants are correct that Perez has not alleged facts establishing that the court's exercise of personal jurisdiction over them is authorized by the Massachusetts long-arm statute or comports with due process.

Other judges in this district have rejected *Bivens* claims against out-of-state prison officials alleged to have been deliberately indifferent to the serious medical needs of inmates held at out-of-state prisons but not alleged or proven to have sufficient contacts with Massachusetts. *See*, *e.g.*, *Middleton v. Murray*, #19-cv-11330-KAR, 2020 WL 6082136, at *3 (D. Mass. Oct. 15, 2020);

---

[31] *See* https://www.bop.gov/locations/institutions/dan/ (last visited September 7, 2022).

*Smolka v. United States*, #08-cv-40166-DPW, 2010 WL 1170438, at *1 (D. Mass. Mar. 25, 2010). On this record, the court joins them.

Defendants' first motion to dismiss is allowed insofar as it seeks dismissal as to Warden Licon-Vitale and Dr. Fabregas-Schindler under Fed. R. Civ. P. 12(b)(2).[32]

## VI. Conclusion.

For the reasons set out above, defendants' second motion to dismiss (#47) is denied as moot and their first motion to dismiss (#36) is allowed. The case is dismissed. A separate order of dismissal will issue.

The Clerk's Office is directed to send a copy of this memorandum and the separate order of dismissal to Marco Perez, #17174-379, Federal Correctional Institute – Beaumont Medium, P.O. Box 26040, Beaumont, Texas, 77720.

/s/ M. Page Kelley
M. Page Kelley
September 14, 2022                          Chief United States Magistrate Judge

---

[32] Even if the court had personal jurisdiction over Warden Licon-Vitale and Dr. Fabregas-Schindler, Perez fails to state a plausible Eighth Amendment claim against them. In the additional complaint, he recounts the course of his treatment at FCI-Danbury, *see* #1-1 at 1-2; *compare* #1-1 at 7-13; #1-2, but he does not go on to articulate a cogent theory of deliberate indifference as to Warden Licon-Vitale and Dr. Fabregas-Schindler, as opposed to Dr. Ruze. *See id*. at 6. Perez does claim that "[t]he BOP" transferred him nine times and required him to go through pain management and the administrative complaint process four times "to drag out" his sentence until he was deported, thereby saving money. (#1-1 at 4); *see also* #2. If he is claiming that his transfer from FCI-Danbury to FMC-Devens amounted to deliberate indifference, that claim is contradicted by his further claim that he *had to be* transferred for post-operative care. (#1 at 5; #1-1 at 2.)